# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| McKenzie County, North Dakota, | ) |
| Plaintiff, | ) **ORDER DENYING UNITED STATES'** |
| | ) **MOTION TO DISMISS AND** |
| vs. | ) **GRANTING PLAINTIFF'S MOTION** |
| | ) **TO AMEND THE COMPLAINT** |
| United States of America, | ) |
| | ) Case No. 1:16-cv-001 |
| Defendant. | ) |

Before the Court is the "United States' Motion to Dismiss" filed on December 20, 2016. See Doc. No. 18. Plaintiff McKenzie County, North Dakota ("McKenzie County" or "County"), filed a response in opposition to the motion on January 31, 2017. See Doc. No. 24. The United States then filed a reply brief on February 27, 2017. See Doc. No. 29. McKenzie County filed a surreply on March 17, 2017, and the United States filed a response to the surreply on March 31, 2017. See Doc. Nos. 32 and 33. For the reasons set forth below, the Defendant United States' motion to dismiss for lack of jurisdiction is denied.

## I.    PROCEDURAL & FACTUAL BACKGROUND

McKenzie County, North Dakota, filed a complaint against the United States on January 11, 2016. See Doc. No. 1. In its complaint, McKenzie County seeks to quiet title to the 6 ¼ percent royalty interest in the mineral estate granted to the County in condemnation judgments entered by this Court in the 1930's and 1940's. McKenzie County filed an amended complaint on April 12, 2016. See Doc. No. 7. On December 20, 2016, the United States filed this motion to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because McKenzie County's complaint is untimely pursuant to the Quiet Title Act, 28 U.S.C. § 2409a ("Quiet Title Act"). The United States contends McKenzie County's complaint is

untimely because the County knew or should have known of the United States' claim to the 6 ¼ percent royalty interest in the mineral estate of "public domain" lands described in the condemnation judgment more than twelve (12) years before McKenzie County initiated this action. Much of the present controversy stems from legal proceedings spanning more than seventy-five (75) years and relating to mineral interests in land in McKenzie County. To provide context for the current manifestation of a long-standing squabble, a discussion of the legal history of lands in McKenzie County is necessary.

### A. Early Condemnation Actions

In the late 1800's through the 1920's, settlers acquired federal lands for agricultural purposes under the Homestead Acts or through purchasing land granted to railroad companies. These homestead patents granted to settlers title to 640 acres, but reserved to the United States the mineral interest in those lands. By the 1930's, extensive drought, along with plowing of sub-marginal farm land, caused the loss of the lands' protective cover. The lands quickly lost fertility and the soil blew, causing "dustbowl" conditions and significant crop failure. As a result, many farms in McKenzie County failed and farmers were unable to pay their property taxes. Consequently, McKenzie County acquired title to significant acreage throughout the County through foreclosures. See McKenzie County v. Hodel, 467 N.W.2d 701, 702 (N.D. 1991). Through these tax foreclosures, McKenzie County acquired both the surface estate and the mineral estate for foreclosed land, except McKenzie County acquired only the surface estate for those lands in which the United States had reserved the mineral interest in the original patent. McKenzie County formalized its ownership of the foreclosed land by quit claim or Sheriff's deed, whether it was both the surface and mineral estates or the surface estate alone.

Due to the economic conditions in the United States, Congress directed the United States Department of Agriculture ("USDA") to acquire failed farmland for conservation and public use purposes. Lands were the subject of the condemnation actions through tax forfeiture proceedings and McKenzie County deeded the forfeited property to the United States with a reservation of a 6¼ royalty interest in oil and gas production. See Doc. No. 20, ¶ 3. In an effort to avoid the claim to a right of redemption under state law by a party who originally forfeited the property and to ensure clear title to the lands, the United States initiated condemnation actions in this Court. Id. The condemnation actions are identified as follows:

1. United States v. 10,683.00 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1000 (D.N.D. June 30, 1937);

2. United States v. 12,344.54 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1001 (D.N.D. Feb. 6, 1938);

3. United States v. 17,463.13 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1002 (D.N.D. Oct. 5, 1938);

4. United States v. 11,994.84 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1006 (D.N.D. Feb. 25, 1938);

5. United States v. 9,914.53 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1007 (D.N.D. Oct. 11, 1939); and,

6. United States v. 11,626.49 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1028 (D.N.D. June 15, 1938).

Id.

Following an agreement by the parties, a judgment was entered in each condemnation action. See Doc. No. 20-1. Each of the judgments identified the lands to be condemned and used language similar to the language found in judgment No. 1000:

> All the above tracts or parcels of land, with the exception of Tracts 872 and 873, are subject to a 6 ¼% percent royalty reservation in favor of McKenzie County, North Dakota, in the minerals which exist or may be developed therein by said McKenzie County. And subject, also, to and excepting all existing public roads, public utilities, easements and rights of way, is therefore taken for said public use.

See Doc. No. 20-1, p. 6. However, when the United States did not grant a 6 ¼ percent royalty in favor of McKenzie County for tracts, the judgments specifically excluded those tracts from the grant.

The United States Department of Interior ("DOI"), through the Bureau of Land Management ("BLM"), is tasked with the responsibility to monitor and manage the royalty payments owed to landowners and monitored the royalty interest reservation to McKenzie County following the judgments entered in the condemnation cases. See Doc. No. 20 at ¶ 4. The United States admits that upon entry of the condemnation judgments, BLM annotated its records to recognize the 6¼ percent royalty interest in favor of McKenzie County for those lands that the previous owner held both the surface and mineral estates and were foreclosed by the County prior to the condemnation proceedings. See id. These minerals received from McKenzie County through tax foreclosure are referred to as "acquired minerals." However, BLM did not annotate its records to reflect the 6 ¼ percent mineral interest reserved in favor of McKenzie County for those lands in which the United States had reserved the mineral interest in the original patent. Id. at ¶ 6. These mineral interests are referred to as "public domain minerals." Id. at ¶ 7. The parties agree lands subject to the condemnation judgments included both lands with acquired minerals and with public domain minerals.

After entry of the condemnation judgments, McKenzie County received payments from operators as a result of the 6 ¼ percent mineral interest reservation annotation in BLM's records. These payments ended in 1985 when BLM directed operators to pay the 6 ¼ percent interest to the United States. The BLM's decision to stop payments to McKenzie County was based wholly on

the North Dakota Supreme Court's decision of *DeShaw v. McKenzie County*, decided more than 20 years earlier.

### B. *DeShaw v. McKenzie County*

In 1962, in *DeShaw v. McKenzie County*, the North Dakota Supreme Court concluded McKenzie County is precluded under North Dakota law from retaining a mineral interest and conveying less than all of its rights, title, and interest to property acquired through tax foreclosure. 114 N.W.2d 263, 265 (N.D. 1962). As a consequence of the North Dakota Supreme Court's *DeShaw* decision, more than twenty (20) years later, on June 7,1985, the United States notified McKenzie County that "royalty payments formerly made to the counties [Billings, Golden Valley, and McKenzie] based on the invalid 6 ¼ royalty reservation are payable to the United States." See Doc. No. 20-4 at 1. BLM's letter to McKenzie County included an attachment, referenced in the letter as "Enclosure 1," which purported to identify lands that were acquired by Billings, McKenzie, or Golden Valley Counties through tax proceedings, and were later acquired by the United States through condemnation actions. The letter specifically informed McKenzie County:

> Effective at 12:01 A.M., July 1, 1985, royalty payments formerly made to the counties based on the invalid 6 ¼ percent royalty reservation are payable to the United States. The lease terms of each of the leases listed on Enclosure 1 are amended accordingly and lessees, approved operators, or designated operators are responsible for compliance with the amended lease terms.

Id. at 1. The letter then identifies Enclosure 1 as "Lands Containing Invalid 6 ¼ Percent Royalty Reservation (Producing Leases)." Id. Enclosure 1 is a tract summary, which identifies the legal description and acquisition number for each tract and lists the serial numbers of leases, unit agreement numbers, and the names of lessees and unit operators. See Doc. No. 20-4, pp. 6-18.

McKenzie County appealed the BLM's letter decision to the Board of Land Appeals, which affirmed the invalidation of the 6 ¼ percent mineral interest reservation in light of *DeShaw*. See

Doc. No. 20-5. In its opinion, the Board of Land Appeals stated McKenzie County, along with Billings County and an oil company, were appealing BLM's decision "declaring invalid royalty reservations . . . in lands acquired by those counties through tax proceedings and subsequently acquired by the United States as the result of condemnation proceedings." See Doc. No. 20-5, p. 2. The Board of Land Appeals describes the scope of BLM's June 7, 1985 decision to cover "119 tracts in McKenzie County, 10 tracts in Billings County, and 2 tracts in Golden Valley County." Id. After the Board of Land Appeals issued its decision on October 20, 1987, affirming the BLM's invalidation of the 6 ¼ percent mineral interest, McKenzie County filed suit in federal court against Donald Hodel, then-Secretary of the Interior, and others on December 16, 1987.

### C. *McKenzie County II*

In the 1987 suit, McKenzie County alleged *DeShaw* was inapplicable to the 6 1/4 percent mineral royalty reservation in the condemnation judgements and requested the U.S. District Court for the District of North Dakota declare the 6 ¼ percent mineral interest belonged to McKenzie County, quiet title in favor of McKenzie County to the 6 ¼ percent mineral interest, and order the defendants to reimburse and pay to McKenzie County the monies due pursuant to the valid 6 ¼ percent mineral interest. See Doc. No. 20-6. McKenzie County's claims were not brought pursuant to the Quiet Title Act. In *McKenzie County v. Hodel* ("*McKenzie County II*"), upon Plaintiff's motion, the Honorable Judge Patrick Conmy certified the question presented in *McKenzie County II* to the North Dakota Supreme Court as follows:

> The question of law can have a different appearance from the 'spin' put on its presentation.
>
> Does a condemnation judgment, pursuant to a stipulation between the parties, recognizing an otherwise invalid reservation of a mineral interest, operate as a conveyance, so as to give validity to the conveyance as between the parties to the stipulation?

> Does a condemnation judgment, brought for the purpose of quieting title in the Federal Government to lands acquired from the County, insulating the federal government from any claims of former owners who lost the land to the County through tax title proceedings, which recognizes an invalid mineral interest reservation, operate as a conveyance back to the county of the mineral interest covered so as to make no longer applicable North Dakota statutory provisions declaring the reservation invalid?

McKenzie County v. Hodel, 467 N.W.2d 701, 703 (N.D. 1991). The North Dakota Supreme Court noted the questions posed by the federal district court could be taken as asking the North Dakota Supreme Court to "construe a federal court judgment and determine its legal effect." Id. Leaving the construction of a federal court judgment to the federal district court, the North Dakota Supreme Court narrowed the questions presented for its consideration to:

I. Under North Dakota law, may title to real property be transferred through a judgment without compliance with the conveyancing statute?

II. Do Chapter 288, 1931 N.D. Sess. Laws, and the North Dakota Supreme Court's decision in *DeShaw* prohibit the County from acquiring title to a mineral interest through operation of a condemnation judgment under the facts presented?

In answering the first question, the North Dakota Supreme Court held "North Dakota conveyancing statutes do not affect the validity or enforceability" of federal condemnation judgments because under Rule 70 of the North Dakota Rules of Civil Procedure, as well as its federal counterpart, a judgment may divest the title of a party and vest it in another, having the effect of conveying real property. Id. at 704; see also N.D. R. Civ. P. 70. Therefore, "North Dakota law does not impede the transfer of title to real property by operation of a judgment." Id. at 705.

The North Dakota Supreme Court then turned to the question of whether Chapter 288, 1931 N.D. Session Laws, and its decision in *DeShaw* prohibit the County from "acquiring title to the disputed mineral rights through operation of the condemnation judgment." Id. The North Dakota

7

Supreme Court concluded nothing in *DeShaw* or Chapter 288 "limits the County's authority to reacquire title to property formerly held by tax title," and more specifically neither *DeShaw* nor Chapter 288 "prohibit the County from acquiring title to mineral interests through operation of a condemnation judgment." Id. at 707.

After the North Dakota Supreme Court issued its order addressing the certified questions, McKenzie County filed a motion for summary judgment in the federal district court case, requesting the Court enter judgment in its favor by confirming McKenzie County's ownership of the 6 ¼ percent mineral interest "in the lands in question" and setting aside the decisions of the BLM and the Board of Land Appeals. Judge Conmy granted the motion, holding "the recognition of a mineral reservation in the County in the federal condemnation judgments operates as a conveyance of that mineral interest to the County." See Doc. No. 20-7 at 2. In the judgment entered, the Court again articulated "a mineral reservation in favor of McKenzie County in the federal condemnation judgments operates as a conveyance of that mineral interest to McKenzie County" and ordered "title to the disputed minerals (6 ¼% royalty) is quieted in McKenzie County; and, the Defendants are barred from any claim in regard to the same or proceeds from the same; that McKenzie County is the owner of the disputed minerals (6 ¼% royalty) free and clear of any claim of the above named defendants." See Doc. No. 20-8 at 3. The judgment was entered June 24, 1991. See id.

### D. Events After *McKenzie County II*

The United States represents to the Court that after Judge Conmy's decision quieting title to the 6 ¼ percent mineral interest in favor of McKenzie County, the BLM "resumed annotating its records to recognize the 6 ¼ percent royalty interest to McKenzie County *for those lands described in its 1987 Complaint*, which were the lands described in the condemnation Judgements

that contained acquired minerals." See Doc. No. 20, ¶ 11 (emphasis added). While the BLM directed well operators to resume payment of a 6 ¼ percent mineral interest to McKenzie County, the record reveals as late as 1993, the BLM was still identifying "additional oil and gas leases subject to the 6 ¼% royalty rate reservation" because "lands were not identified on [BLM's] records during [its] initial review." See Doc. Nos. 24-11 and 24-12. McKenzie County represents that the BLM's application of Judge Conmy's decision was not limited to those lands enumerated on Enclosure 1, attached to the BLM's decision letter in 1985, but extended to other lands. Consequently, after the 1991 Judgment, McKenzie County, along with companion counties, made efforts to ascertain what lands within the counties were burdened by the 6 ¼ percent mineral interest in favor of the counties in light of the 1991 Judgment. By at least 1998, McKenzie County had initiated a "Natural Resource Inventory" project to review legal records and condemnation judgments, with State's Attorney Dennis Johnson traveling to Kansas City, Missouri, to retrieve legal records of the 1930's condemnation actions. See Doc. No. 24-2, pp. 5, 36. During this process, on November 17, 2003, Karen Johnson, Chief of the Fluids Adjudication Section in the BLM Billings Field Office, sent a fax to Dennis Johnson and Keith Winter that stated, in part: "Our records show only the acquired minerals in the Judgments/Partial Judgments of Declarations of Taking At Law Nos. 1000, 1001, 1002, 1006, 1007, 1028, 1036 and 1042 are subject to a 6 ¼% royalty reservations." See Doc. No. 24-4, p. 13.

On December 19, 2003, McKenzie County Commissioner Roger Chinn and Billings County Commissioner Jim Arthaud met with Elaine Kaufman, Karen Johnson, and Joan Seibert from the BLM Fluids Adjudication Section in Billings, Montana, to compare the tracts of lands the records obtained by the Counties of the commendation judgments subject to a 6 ¼ percent royalty reservation and the BLM records. Chinn and Arthaud provided the BLM with copies of the condemnation judgments and documents from the condemnation proceeding, as well as a list

of the legal descriptions of the tracts of land in McKenzie, Golden Valley, and Billings Counties that were tied to a specific paragraph in the At Law Judgments recognizing the 6¼ percent royalty interest grant to the Counties. After the meeting, Karen Johnson sent an email to individuals within the BLM indicating the Counties provided the BLM with "a list of legal descriptions which provides reference to the At Law #s and the Tract #s" and "[BLM] will review the information they provided to ensure our records accurately reflect the 6 ¼% outstanding royalty reservation in Slope, Golden Valley, McKenzie, and Billings Counties." See Doc. No. 24-2, p. 84.

On January 27, 2004, Roger Chinn, as McKenzie County Commissioner, received a letter from Karen Johnson from the BLM informing the Counties of the result of the BLM's audit of lands subject to a 6 ¼ percent mineral interest in favor of the Counties. See Doc. No. 24-2, pp. 92-93. In the letter, Johnson indicated McKenzie County claimed 74,032.81 acres are subject to a 6 ¼ percent royalty reservation, but the BLM's records show only 58,368.94 acres are subject to the reservation; Golden Valley County claimed 5,925.27 acres are subject to a 6 ¼ percent royalty reservation, but the BLM's records show only 3,845.27 acres are subject to the reservation; and Billings County claimed 14,921.63 acres are subject to a 6 ¼ percent reservation, but the BLM's records show only 13,990.94 acres are subject to the reservation. Johnson explains the discrepancy between the Counties' records and the BLM's records: "the acreage differences between our records and yours are primarily because your records included lands with Public Domain minerals. Only lands acquired by the United States in the condemnations are subject to a 6 ¼ percent royalty reservation." Id. The letter also included attachments enumerating lands in McKenzie, Golden Valley, and Billings County in which the BLM does not recognize a 6 ¼ percent mineral reservation in favor of the Counties because those minerals are either public domain minerals or were specifically excluded from the reservation in the original condemnation judgments.

10

After McKenzie County received Johnson's January 27, 2004 letter, McKenzie and Billings Counties exchanged several letters with the BLM to clarify the status of certain lands. In this correspondence, the Billings Field Office of the BLM indicated it would direct the Counties' request for recognition of the 6 ¼ percent mineral reservation in all lands acquired through condemnation judgements to BLM's Rock Mountain Field Solicitor "for an opinion regarding [their] claim to a 6 ¼ percent royalty in lands with public domain minerals acquired through condemnation." See Doc. No. 24-2, p. 116. On December 16, 2004, Johnson sent a letter to Chinn and Arthaud indicating BLM's Rocky Mountain Region Field Solicitor reviewed the Counties' claim to a 6 ¼ percent in all lands in the condemnation judgments, and determined "the Bureau of Land Management's decision to issue public domain mineral leases without a royalty reservation to the counties is defensible." See Doc. No. 24-2, p. 118. McKenzie County sent a letter to the United States Department of the Interior, Office of the Solicitor, on March 7, 2005, requesting the office review the opinion of the Rocky Mountain Region Field Solicitor and direct the BLM to recognize a 6 ¼ percent royalty reservation in favor of the Counties for all lands acquired by the United States in the condemnation judgments. See Doc. No. 24-4, pp. 15, 20. According to the record, the Department of the Interior did not respond to McKenzie County's letter.

McKenzie County initiated this action on January 11, 2016, and filed an amended complaint on April 12, 2016. See Doc. Nos. 1 and 7. The sole cause of action in the amended complaint is to quiet title to the 6 ¼ percent mineral interest in favor of McKenzie County for specific tracts of lands. On December 20, 2016, the United States filed a motion to dismiss the County's amended complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. See Doc. No. 18. The United States contends McKenzie County's complaint is barred by the twelve (12) year statute of limitations in the Quiet Title Act.

11

## II. STANDARD OF REVIEW

The United States requests the Court dismiss McKenzie County's amended complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. When considering a motion to dismiss, the Court must generally construe the complaint liberally and assume all factual allegations to be true. Eckert v. Titan Tire Corp., 514 F.3d 801, 806 (8th Cir. 2008). Dismissal will not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle plaintiff to relief.

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs challenges to subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Here, the United States asserts a factual challenge to the Court's jurisdiction. In such a factual 12(b)(1) motion, the trial court's jurisdiction – its very power to hear the case – is at issue, and the trial court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990). As a result, "no presumptive truthfulness attaches to the plaintiff's allegations" and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 744 (8th Cir. 2001). The burden is on the plaintiff to demonstrate jurisdiction exists. Id.

## III. LEGAL ANALYSIS

McKenzie County brought this action to "quiet title to the 6 ¼ percent royalty interest in the mineral estate granted to the County as part of the condemnation of the lands by the United States." See Doc. No. 7, p. 18. The United States requests the Court dismiss the County's amended complaint pursuant to Rule 12(b)(1) of the Federal Rule of Civil Procedure because the Plaintiff's claim is untimely pursuant to the Quiet Title Act and, consequently, this Court lacks jurisdiction over the matter. McKenzie County contends its claim is timely as its complaint was filed within

the twelve (12) year statute of limitations of the Quiet Title Act and the Court has jurisdiction over the matter. In the alternative, McKenzie County requests leave to file a second amended complaint.

The United States is immune from suit absent a waiver of sovereign immunity. Hart v. United States, 630 F.3d 1085, 1088 (8th Cir. 2011). The Quiet Title Act ("QTA") provides a limited waiver of sovereign immunity:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.

28 U.S.C. § 2409a(a). The QTA is the exclusive means by which an adverse claimant can challenge the United States' title to real property. Block v. North Dakota *ex rel.* Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983). "Because the QTA waives the government's sovereign immunity from suit, a plaintiff must comply with the limitations period to effectuate that waiver. Hence the QTA statute of limitations acts as a jurisdictional bar unlike most statutes of limitations, which are affirmative defenses." Spirit Lake Tribe, 262 F.3d at 737-38 (internal citations omitted).[1]

Subsection (g) of 28 U.S.C. § 2409a, describes the statute of limitations applicable to claims brought by persons or entities, such as a county:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or

---

[1] Some circuit courts of appeal have questioned whether the QTA's limitations period serves as a jurisdictional bar. In *Irwin v. Dep't of Veteran Affairs*, the United States Supreme Court concluded the statute of limitations in an employment discrimination action against the United States was subject to equitable tolling. 498 U.S. 89, 95-96 (1990). Courts have interpreted *Irwin* to imply a statute of limitations does not function as a jurisdictional bar for claims against the United States. See, e.g., Wisconsin Valley Improvement Co. v. United States, 569 F.3d 331, 334 (7th Cir. 2009). For example, in *Schmidt v. United States*, the Eighth Circuit concluded the statute of limitations in the Federal Tort Claims Act is not jurisdictional pursuant to the Supreme Court's holding in *Irwin*. 933 F.2d 639, 640 (8th Cir. 1991). Nonetheless, absent an express contrary manifestation by the Eighth Circuit or the United States Supreme Court, this Court follows the Eighth Circuit's determination in *Spirit Lake Tribe* that the QTA's statute of limitations serves as a bar to the district court's jurisdiction. See 262 F.3d at 737-38.

> his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g). In <u>Spirit Lake Tribe</u>, the Eighth Circuit discussed the operation of the statute of limitations of subsection (g). Specifically the Eighth Circuit stated that subsection (g) does not require the government to provide explicit notice of its claim. <u>Spirit Lake Tribe</u>, 262 F.3d at 738. In fact, the government's claim need not be "clear and unambiguous." <u>Id.</u> (citing <u>North Dakota ex rel. Bd. of Univ. & Sch. Lands v. Block</u>, 789 F.2d 1308, 1313 (8th Cir. 1986). "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." <u>Id.</u> (quoting <u>Knapp v. United States</u>, 636 F.2d 279, 283 (10th Cir. 1980)). Courts have consistently held that to trigger the QTA general limitation period in subsection (g) a plaintiff must have a "reasonable awareness that the Government claims some interest *adverse* to the plaintiff's." <u>Knapp</u>, 636 F.2d at 283 (emphasis added); <u>see</u>, <u>e.g.</u>, <u>Kane Cnty v. United States.</u>, 772 F.3d 1205, 1215 (10th Cir. 2014); <u>Michel v. United States</u>, 65 F.3d 130, 131-32 (9th Cir. 1995); and <u>North Dakota ex rel Bd. of Univ. & Sch. Lands v. Block</u>, 789 F.2d 1308, 1313 (8th Cir. 1986). The only notice sufficient to trigger the limitation period is notice of an *adverse* claim, <u>San Juan Cnty. v. United States</u>, 754 F.3d at 787, 795-96 (10th Cir. 2014), because when the plaintiff claims a non-possessory interest in property, such as a mineral royalty, "knowledge of a government claim of ownership may be entirely consistent" with the plaintiff's claim. <u>Michel</u>, 65 F.3d at 132.

In the present motion, the Court has been asked to determine whether McKenzie County complied with the limitations period of the Quiet Title Act to effectuate a waiver of sovereign immunity by the United States. Because McKenzie County instituted its action on January 11, 2016, its attempt to quiet title is barred if the County "knew or should have known" of the United

States' claim to the 6 ¼ percent mineral interest for public domain minerals on lands within the condemnation judgments by January 10, 2004. See Doc. No. 1.

In its motion, the United States contends the limitations period of the QTA bars McKenzie County's claim because the United States has consistently maintained the 6 ¼ percent mineral reservation in the commendation judgment applies only to those minerals acquired by McKenzie County through tax proceedings and does not apply to public domain minerals. Specifically, the United States directs the Court to several events that occurred prior to January 10, 2004, to demonstrate McKenzie County knew or should have known of the United States' claim to the 6 ¼ percent mineral interest in public domain minerals on those lands included in the condemnation judgments; namely: (1) A 1981 Letter from the BLM to McKenzie County; (2) the BLM's historic non-payment of royalties for public domain minerals on those lands included in condemnation judgments; (3) McKenzie County's initiation of its a "Natural Resource Inventory" project to review legal records and condemnation judgments; (4) Minutes for County Commission meetings in McKenzie, Golden Valley, and Billings Counties; (5) the correspondence between McKenzie County and the BLM after entry of judgment in *McKenzie County II*.

In its response to the United States' motion, McKenzie County contends not only did it timely bring this action, but this Court's holding in *McKenzie County II* already quieted title to the 6 ¼ percent mineral interest in favor of McKenzie County for both acquired and public domain minerals in those lands described in 1930's-1940's condemnation judgments. McKenzie County also contends the doctrines of collateral estoppel and res judicata preclude the United States from denying and relitigating McKenzie County's ownership of the 6 ¼ percent mineral interest in any lands conveyed to the United States in the condemnation judgments.

Before addressing whether those specific events or communications described above triggered the QTA limitation period, the Court first turns to consider whether the judgment entered

in *McKenzie County II* or the condemnation judgments preclude the parties from relitigating title to the 6 ¼ percent mineral interest in favor of McKenzie County in this matter. Assuming, *arguendo*, that the Court were to conclude those actions already quieted title to the 6 ¼ percent mineral interest for public domain minerals, such conclusion would certainly alter the landscape of this action.

The Court has carefully and thoroughly reviewed the record in this case, particularly the materials submitted by the parties related to the litigation of *McKenzie County II* in this Court and the condemnation judgments. In *McKenzie County II*, this Court specifically held "the recognition of a mineral reservation in the County in the federal condemnation judgments operates as a conveyance of that mineral interest to the County." See Doc. No. 20-7. In the judgment entered upon Judge Conmy's grant of summary judgment, the Court again articulated "a mineral reservation in favor of McKenzie County in the federal condemnation judgments operates as a conveyance of that mineral interest to McKenzie County" and ordered "title to the *disputed minerals* (6 ¼% royalty) is quieted in McKenzie County; and, the Defendants are barred from any claim in regard to the same or proceeds from the same; that McKenzie County is the owner of the *disputed minerals* (6 ¼% royalty) free and clear of any claim of the above named defendants." See Doc. No. 20-8 (emphasis added). The condemnation judgments referred to in the *McKenzie County II* judgment, plainly state: "All the above tracts or parcels of land . . . are subject to a 6 ¼% percent royalty reservation in favor of McKenzie County, North Dakota, in the minerals which exist or may be developed therein by said McKenzie County." See Doc. No. 20-1, p. 6. Whether the *McKenzie County II* judgment, along with the earlier condemnation judgments, has quieted title to the mineral interest in dispute here (i.e. public domain minerals) turns on the breadth of Judge Conmy's decision and the scope of the phrase "disputed minerals" as used in the *McKenzie County II* judgment. The Court combed the records from *McKenzie County II* submitted by the

parties to help provide context for the phrase "disputed minerals." The Court looked to the complaint in McKenzie County II, in which the County described the dispute as follows:

> 2. This lawsuit consists of a dispute over ownership of a 6 ¼% interest under certain lands located in McKenzie County (said lands are described in Enclosure 1 of Exhibit A attached hereto and made a part hereof, and will be herein referred to as "subject lands"). All of the subject lands were patented by the United States Government into private ownership. McKenzie County acquired the lands by tax sale proceedings.

Doc. No. 20-6. Neither this allegation or other allegations of the complaint, or any other pleading from *McKenzie County II* submitted by the parties, define the scope of the lawsuit in terms of "disputed minerals," and the United States' answer to the complaint in *McKenzie County II* is not part of the record before the Court. Although there is reference in the *McKenzie County II* complaint to "Enclosure I" (originating from the BLM's 1985 letter to McKenzie County), nothing in the record defines the "disputed minerals." With these considerations, the Court is convinced that title to the 6 ¼ percent mineral interest in the lands identified in the complaint filed in this action was already quieted by this Court in the 1991 judgment or the condemnation judgments. In fact, based upon the plain language of the condemnation judgments (stating "[a]ll the above tracts or parcels of land . . . are subject to a 6¼% percent royalty reservation in favor of McKenzie County, North Dakota, in the minerals which exist or may be developed therein by said McKenzie County.") and the holding of the North Dakota Supreme Court in *DeShaw* and *McKenezie County*, the Court is left with the clear impression the 6 ¼ percent mineral interest in dispute in this case may have already been quieted. If such is the case, the Court's jurisdictional inquiry changes substantially because the actions of the BLM since the 1930's described in the United States' motion to dismiss have forced the County to relitigate an issue already decided and seek relief from this Court to enforce judgments previously entered against the United States. Therefore, under these circumstances, the Court concludes it is in the interests of justice to grant McKenzie

17

County leave to file a second amended complaint to assert additional claims supported by the record.

IV. **CONCLUSION**

The Court has carefully scrutinized, considered, and weighed each of the hundreds of documents in the record. Based on the foregoing, the Court **DENIES** the United States' motion to dismiss McKenzie County's amended complaint (Doc. No. 18) and **GRANTS** McKenzie County leave to file a second amended complaint. McKenzie County is to file its second amended complaint on or before August 30, 2019.

**IT IS SO ORDERED**.

Dated this 6th day of August, 2019.

/s/ *Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court