**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| McKenzie County, North Dakota, | ) | |
| | ) | **ORDER GRANTING** |
| Plaintiff, | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| United States of America and the | ) | |
| Department of the Interior, | ) | Case No. 1:16-cv-001 |
| | ) | |
| Defendants. | ) | |

Before the Court are cross motions for summary judgment filed on May 24, 2023.  See Doc. Nos. 71 and 72.  The motions have been fully briefed.  See Doc. Nos. 71-1, 73, 74, 75, 76, and 77. For the reasons set forth below, the Plaintiff's motion for summary judgment is granted and the Defendant's motion for summary judgment is denied.

I.      **BACKGROUND**

This case began when McKenzie County, North Dakota, filed a complaint against the United States on January 11, 2016.  See Doc. No. 1.  In its complaint, McKenzie County sought to quiet title to the 6 ¼ percent royalty interest in the mineral estate granted to it in six condemnation judgments entered by this Court in the 1930's.  McKenzie County filed an amended complaint on April 12, 2016.  See Doc. No. 7.  On August 6, 2019, the Court denied the United States' motion to dismiss for lack of subject matter jurisdiction.  See Doc. No. 36.  A second amended complaint was filed on August 30, 2019, alleging claims for enforcement of the Court's judgments in prior related litigation and, in the alternative, to quiet title to the disputed mineral interests under the Quiet Title Act, 28

1

U.S.C. § 2409a ("Quiet Title Act").  See Doc. No. 37.  On September 9, 2020, the Court denied the United States' motion to dismiss the second amended complaint.  See Doc. No. 49.  Much of the present controversy stems from legal proceedings spanning more than seventy-five (75) years and relating to mineral interests in land located in McKenzie County.  Now before the Court are cross motions for summary judgment.  See Doc. Nos. 71 and 72.  To provide context for the current motions, a discussion of the long legal history of the disputed lands and minerals in McKenzie County is necessary.

A.   **Early Condemnation Actions**

From the late 1800's through the 1920's, settlers acquired federal lands for agricultural purposes under the Homestead Act of 1862,  the Stock-Raising Homestead Act of 1916, the Mineral Lands and Mining Act of 1914, or through purchasing land granted to railroads by the United States in the western United States, including McKenzie County in western North Dakota.  In some cases the patent granted the settler title to both the surface and mineral estate while in others the United States reserved the mineral interest.

In the 1930's, prolonged drought along with economic depression caused many farms in McKenzie County to fail and farmers were unable to pay their property taxes.  Consequently, McKenzie County acquired title to significant acreage through foreclosures.  See McKenzie County v. Hodel, 467 N.W.2d 701, 702 (N.D. 1991).  Through these tax foreclosures, McKenzie County acquired title to the foreclosed land, including the minerals if the farmer owned them prior to foreclosure.  McKenzie County formalized its ownership of the foreclosed land by quit claim or Sheriff's deed, whether it was both the surface and mineral estates or the surface estate alone.

Due to the difficult economic conditions in the United States in the 1930's, Congress directed the United States Department of Agriculture ("USDA") to acquire failed farmland for conservation and other public purposes, including grazing.  The USDA program in North Dakota was known as the Little Missouri Land Adjustment Project.  The acquisitions were accomplished pursuant to a number of federal programs including the National Industrial Recovery Act of 1933, Emergency Relief Appropriations Act of 1935, Emergency Relief Appropriations Act of 1936, and the Bankhead-Jones Farm Tenant Act of 1937.  Congress authorized the USDA to not only acquire land, but also authorized it to grant, sell, lease, or otherwise dispose of such property.

In furtherance of these Congressional directives, the Secretary of Agriculture, with the assistance of the Attorney General, negotiated the purchase of foreclosed lands from McKenzie County.  Pursuant to the agreement reached between McKenzie County and the United States, McKenzie County deeded all interests it owned in the foreclosed lands to the United States in exchange for a small cash payment, a 6 ¼ percent perpetual royalty interest in the oil and gas production on all of the foreclosed lands, and cooperation with condemnation proceedings.  The deeds from McKenzie County to the United States did not recite any royalty reservation, although the declarations of taking and final judgments noted the 6 ¼ percent perpetual royalty interest in favor of McKenzie County.  See Doc. No. 47-5, pp. 6 and 59.  In an effort to avoid a claim to a right of redemption under state law by the party who originally forfeited the property, and to ensure clear title to the lands, the United States initiated "friendly" condemnation actions in federal district court in North Dakota which were unopposed by McKenzie County.  The six relevant condemnation actions are identified as follows:

1. United States v. 10,683.00 Acres of Land, More or Less, in McKenzie County,

3

State of North Dakota, At Law No. 1000 (D.N.D. June 30, 1937);

2. United States v. 12,344.54 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1001 (D.N.D. Feb. 6, 1938);

3. United States v. 17,463.13 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1002 (D.N.D. Oct. 5, 1938);

4. United States v. 11,994.84 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1006 (D.N.D. Feb. 25, 1938);

5. United States v. 9,914.53 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1007 (D.N.D. Oct. 11, 1939); and,

6. United States v. 11,626.49 Acres of Land, More or Less, in McKenzie County, State of North Dakota, At Law No. 1028 (D.N.D. June 15, 1938).

See Doc. Nos. 47-2, 47-3, 47-4, 47-5, 47-6, and 47-7 (collectively referred to as the "Condemnation Judgments" and often referenced by the "At Law" number). Following an agreement by the parties, a Declaration of Taking, which started the condemnation process, was filed and eventually a final judgment was entered in each condemnation action. See Doc. Nos. 47-2, p. 5; 47-3, p. 6; 47-4,p. 6; 47-5, p. 6; 47-6, p. 9; and 47-7, p. 6.

The Declarations of Taking signed by the Secretary of Agriculture, and caused to be filed in five of the six condemnation cases, provided the United States took the described lands in fee simple and "subject, however, to the rights of McKenzie County, State of North Dakota, to a 6 ¼% perpetual royalty in minerals which exist or may be developed on said lands..." See Doc. Nos. 47-2, p. 5, 47-3, p. 6, 47-4, p. 6, 47-5, p. 6, and 47-7, p. 6. In At Law 1000 the Declaration of Taking similarly provided the United States' interest was taken "subject, however, to the rights of McKenzie County, State of North Dakota, to a 6 ¼% perpetual royalty in minerals which may exist or may be developed on all of said tracts..." and a second reference therein stated the United States' interest was

"subject to a 6 ¼ percent royalty reservation in favor of McKenzie County..." See Doc. No. 47-6, pp. 6 and 9.

The final judgments and partial final judgments entered in each case stated, with some slight variations, as follows:

> That the United States of America is the owner in fee simple of the lands hereinbefore described, subject, however, to the rights of McKenzie County, North Dakota, to a 6 ¼% perpetual royalty in minerals which exist or may be developed on said lands.

See Doc. Nos. 47-2, pp. 49, 59, and 89; 47-3, pp. 50 and 72; 47-4, pp. 46, 55, and 83; 47-5, p. 59; 47-6, p. 60; and 47-7, pp. 69 and 84. The Court retained jurisdiction in each case in order to enter such further orders or decrees as may be necessary. See Doc. Nos. 47-2, pp. 50, 59, and 90; 47-3, pp. 51 and 73; 47-4, pp. 47, 55, and 84; 47-5, p. 60; 47-6, p. 61; and 47-7, pp. 70 and 85.

The United States Department of Interior ("DOI"), through the Bureau of Land Management ("BLM"), is tasked with the responsibility to monitor and manage the royalty payments owed to landowners and monitored McKenzie County's 6¼ percent perpetual royalty interest following the entry of the Condemnation Judgments. See Doc. No. 20 at ¶ 4. Upon entry of the Condemnation Judgments, BLM annotated its records to recognize the 6¼ percent royalty interest in favor of McKenzie County for those lands where the previous owner held both the surface and mineral estates and were foreclosed by McKenzie County prior to the condemnation proceedings. See Doc. No. 20 at ¶ 4. These minerals, received from McKenzie County through tax foreclosure, are referred to by the BLM as "acquired minerals." Unbeknownst to McKenzie County, the BLM did not annotate its records to reflect the 6 ¼ percent royalty interest in favor of McKenzie County for those lands in which the United States had reserved the mineral interest in the original patent. Id. at ¶ 6.

5

These mineral interests are referred to by the BLM as "public domain minerals." Id. at ¶ 7. The lands subject to the Condemnation Judgments included both lands with "acquired minerals" and lands with "public domain minerals." The Condemnation Judgments do not use the terms "acquired minerals" or "public domain minerals" or make any distinction between the two terms, and only an investigation of title could reveal the distinction. In other words, the terms "acquired minerals" or "public domain minerals" are not used anywhere in the final judgments from the 1930's. These terms are also not used or even referred to in the Declarations of Taking. The 6¼ royalty interest conveyed to McKenzie County is located in the universal paragraph found in each judgment, and applied to all tracts of land listed in each judgment unless the tract was expressly excluded.

After entry of the Condemnation Judgments, McKenzie County received payments from operators as a result of the 6 ¼ percent royalty interest annotation in BLM's records, at least as to the so-called "acquired minerals." These payments stopped in 1985 when the BLM directed operators to pay the 6 ¼ percent royalty interest to the United States. The BLM's unilateral decision to stop payments to McKenzie County was based solely on their interpretation of the North Dakota Supreme Court's 1962 decision in *DeShaw v. McKenzie County*, 114 N.W.2d 263 (N.D. 1962) (holding North Dakota law did not permit a county to convey anything less than all of its interest in a tax title, thus effectively foreclosing any right of redemption). This BLM decision to stop the royalty payments to McKenzie County occurred more than 20-years after the holding in *DeShaw*.

B.    DeShaw v. McKenzie County

In 1962, in *DeShaw v. McKenzie County*, the North Dakota Supreme Court concluded McKenzie County was precluded under North Dakota law from retaining a mineral interest and

6

conveying less than all of its rights, title, and interest to property acquired through tax foreclosure. 114 N.W.2d 263, 265 (N.D. 1962).  On June 7, 1985, and as a consequence of the North Dakota Supreme Court's *DeShaw* decision in 1962, the BLM notified McKenzie County that as of July 1, 1985, "royalty payments formerly made to the counties [Billings, Golden Valley, and McKenzie] based on the invalid 6 ¼ percent royalty reservation are payable to the United States."  See Doc. No. 20-4, p 1.  The effect of the letter was to invalidate McKenzie County's 6 ¼ percent royalty interest created by the Condemnation Judgments from the 1930's.

McKenzie County appealed the BLM's June 7, 1985, letter decision to the Interior Board of Land Appeals ("IBLA").  On October 20, 1987, the IBLA issued an opinion affirming the BLM's invalidation of the 6 ¼ percent royalty interest in light of *DeShaw*.  See Doc. No. 20-5.  In its opinion, the IBLA stated McKenzie County, along with Billings County and an oil company, were appealing BLM's decision "declaring invalid royalty reservations . . . in lands acquired by those counties through tax proceedings and subsequently acquired by the United States as the result of condemnation proceedings."  See Doc. No. 20-5, p. 2.  On December 16, 1987, McKenzie County filed suit in federal court against Donald Hodel, then-Secretary of the Interior, and others, seeking to quiet title to its 6 ¼ percent royalty interest created by the condemnation judgments.  See McKenzie County v. Hodel, No. A4-87-211 (D.N.D. Dec. 17,1987) ("*McKenzie II*").

## C.    McKenzie County II

In the 1987 federal suit (*McKenzie II*), McKenzie County alleged *DeShaw* was inapplicable to the 6 ¼ percent  royalty interest in the Condemnation Judgements.  They requested the Court declare the 6 ¼ percent royalty interest belonged to McKenzie County, quiet title in favor of

McKenzie County to the 6 ¼ percent royalty interest, and order the defendants to reimburse and pay

to McKenzie County the monies due pursuant to the valid 6 ¼ percent royalty interest.  See Doc. No.

20-6, p. 22.  Upon McKenzie County's motion, the Court (Judge Patrick A. Conmy) certified two

questions to the North Dakota Supreme Court:

> The question of law can have a different appearance from the 'spin' put on its
> presentation.
>
> Does a condemnation judgment, pursuant to a stipulation between the parties,
> recognizing an otherwise invalid reservation of a mineral interest, operate as a
> conveyance, so as to give validity to the conveyance as between the parties to the
> stipulation?
>
> Does a condemnation judgment, brought for the purpose of quieting title in the
> Federal Government to lands acquired from the County, insulating the federal
> government from any claims of former owners who lost the land to the County
> through tax title proceedings, which recognizes an invalid mineral interest
> reservation, operate as a conveyance back to the county of the mineral interest
> covered so as to make no longer applicable North Dakota statutory provisions
> declaring the reservation invalid?

McKenzie County v. Hodel, 467 N.W.2d 701, 703 (N.D. 1991) ("McKenzie I").  The North Dakota

Supreme Court noted the questions posed by the federal district court could be taken as asking the

North Dakota Supreme Court to "construe a federal court judgment and determine its legal effect."

Id.  Leaving the construction of the Condemnation Judgments to the federal district court, the North

Dakota Supreme Court narrowed the questions presented for its consideration to:

> I.      Under North Dakota law, may title to real property be transferred through a
> judgment without compliance with the conveyancing statutes?
>
> II.      Do Chapter 288, 1931 N.D. Sess. Laws, and DeShaw v. McKenzie County,
> 114 N.W.2d 263 (N.D. 1962), prohibit the County from acquiring title to a mineral
> interest through operation of a condemnation judgment under the facts presented?

Id. at 704.

In answering the first question, the North Dakota Supreme Court held "North Dakota conveyancing statutes do not affect the validity or enforceability" of federal condemnation judgments because under Rule 70 of the North Dakota Rules of Civil Procedure, as well as its federal counterpart, a judgment may divest the title of a party and vest it in another, having the effect of conveying real property.  Id. at 705; see also N.D. R. Civ. P. 70.  The North Dakota Supreme Court recognized that a federal condemnation judgment creates a new title, extinguishes all previous rights, and has the effect of a conveyance despite the use of language of reservation.  Id.  Therefore, "North Dakota law does not impede the transfer of title to real property by operation of a judgment."  Id.

The North Dakota Supreme Court then turned to the question of whether Chapter 288, 1931 N.D. Session Laws, and its decision in *DeShaw* prohibit the County from "acquiring title to the disputed mineral rights through operation of the condemnation judgment."  Id.  The North Dakota Supreme Court concluded nothing in *DeShaw* or Chapter 288 "limits the County's authority to reacquire title to property formerly held by tax title," and more specifically "Chapter 288, and its interpretation in *Deshaw* do not prohibit the County from acquiring title to mineral interests through operation of a condemnation judgment."  Id. at 707.

After the North Dakota Supreme Court issued its order addressing the certified questions, McKenzie County filed a motion for summary judgment in the federal district court case, requesting the Court enter judgment in its favor by confirming McKenzie County's ownership of the disputed 6 ¼ percent royalty interest and setting aside the decisions of the BLM and the Interior Board of Land Appeals.  See Doc. No. 24-9, pp. 2-3.  The Court granted the motion and held that "the recognition of a mineral reservation in the County in the federal condemnation judgments operates as a conveyance of that mineral interest to the County."  See Doc. No. 20-7 at 2.  Judgment quieting

title in the disputed minerals in favor of McKenzie County was entered on June 24, 1991 ("1991 Judgment"). <u>See</u> Doc. No. 20-8.  In the 1991 Judgment, the Court concluded "a mineral reservation in favor of McKenzie County in the federal condemnation judgments operates as a conveyance of that mineral interest to McKenzie County" and ordered "title to the disputed minerals (6 ¼% royalty) is quieted in McKenzie County; and, the Defendants are barred from any claim in regard to the same or proceeds from the same; that McKenzie County is the owner of the disputed minerals (6 ¼% royalty) free and clear of any claim of the above named defendants." <u>See</u> Doc. No. 20-8 at 3.  The United States did not appeal the 1991 Judgment.

### D.   <u>Events After McKenzie County II</u>

After the 1991 Judgment was entered quieting title to the 6 ¼ percent royalty interest in favor of McKenzie County, the BLM "resumed annotating its records to recognize the 6 ¼ percent royalty interest to McKenzie County for those lands described in its 1987 complaint, which were the lands described in the Condemnation Judgments that contained acquired minerals." <u>See</u> Doc. No. 20, ¶ 11.   McKenzie County understood the 1991 Judgment to apply to all tracts listed in the Condemnation Judgments.  <u>See</u> Doc. No. 24-2, ¶ 4.  However, and unbeknownst to McKenzie County, the BLM did not annotate its records to apply the 1991 Judgment to the tracts referenced in the Condemnation Judgments which BLM determined pertained to "public domain minerals." <u>See</u> Doc. No. 20, ¶ 13, 24-2, ¶¶ 4-5.  Again, this was a term never used in the Condemnation Judgments.  While the BLM directed well operators to resume payment of a 6 ¼ percent royalty interest to McKenzie County on the "acquired mineral" tracts, the record reveals as late as 1993, the BLM was still identifying "additional oil and gas leases subject to the 6 ¼ percent royalty rate

reservation" because "lands were not identified on [BLM's] records during [its] initial review." <u>See</u> Doc. Nos. 24-11 and 24-12.

After the 1991 Judgment was entered, McKenzie County, along with other companion counties, made efforts to ascertain what lands within the counties were burdened by the 6 ¼ percent royalty interest. By 1998, McKenzie County had undertaken a "Natural Resource Inventory" project to review legal records and condemnation judgments, with State's Attorney Dennis Johnson traveling to Kansas City, Missouri, to retrieve legal records of the 1930's condemnation actions. <u>See</u> Doc. No. 24-2, pp. 5, 36. On November 17, 2003, Karen Johnson, Chief of the Fluids Adjudication Section in the BLM Billings Field Office, sent a fax to McKenzie County States's Attorney Dennis Johnson and Keith Winter that stated, in part: "Our records show only the acquired minerals in the Judgments/Partial Judgments of Declarations of Taking At Law Nos. 1000, 1001, 1002, 1006, 1007, 1028, 1036 and 1042 are subject to a 6 ¼% royalty reservations." <u>See</u> Doc. No. 24-4, p. 13. As previously noted, the term "acquired minerals" is a term created solely by the BLM but never used in any of the Condemnation Judgments or the Declarations of Taking.

On December 19, 2003, McKenzie County Commissioner Roger Chinn and Billings County Commissioner Jim Arthaud met with Elaine Kaufman, Karen Johnson, and Joan Seibert from the BLM Fluids Adjudication Section in Billings, Montana, to compare the tracts of lands the records obtained by the Counties of the commendation judgments subject to a 6 ¼ percent royalty interest and the BLM records. <u>See</u> Doc. No. 24-2, p. 10. Chinn and Arthaud provided the BLM with copies of the Condemnation Judgments and documents from the condemnation proceeding, as well as a list of the legal descriptions of the tracts of land in McKenzie, Golden Valley, and Billings Counties that were tied to a specific paragraph in the condemnation judgments recognizing the 6¼ percent royalty

interest grant to the Counties.  Id.  After the meeting, Karen Johnson sent an email to individuals within the BLM indicating the Counties provided the BLM with "a list of legal descriptions which provides reference to the At Law #s and the Tract #s" and "[BLM] will review the information they provided to ensure our records accurately reflect the 6 ¼% outstanding royalty reservation in Slope, Golden Valley, McKenzie, and Billings Counties."  See Doc. No. 24-2, p. 84.

On January 30, 2004, McKenzie County Commissioner Roger Chinn received a letter from Karen Johnson from the BLM dated January 27, 2004,  informing the Counties of the result of the BLM's review of lands subject to a 6 ¼ percent royalty interest in favor of the Counties.  See Doc. No. 24-2, pp. 92-93.  In the letter, the BLM indicated McKenzie County claimed 74,032.81 acres are subject to a 6 ¼ percent royalty reservation, but the BLM's records show only 58,368.94 acres are subject to the reservation; Golden Valley County claimed 5,925.27 acres are subject to a 6 ¼ percent royalty reservation, but the BLM's records show only 3,845.27 acres are subject to the reservation; and Billings County claimed 14,921.63 acres are subject to a 6 ¼ percent reservation, but the BLM's records show only 13,990.94 acres are subject to the reservation.  The BLM explained the discrepancy between the Counties' records and the BLM's records: "the acreage differences between our records and yours are primarily because your records included lands with Public Domain minerals.  Only lands acquired by the United States in the condemnations are subject to a 6 ¼ percent royalty reservation."  See Doc. No. 24-2, p. 92.  The letter also included attachments enumerating lands in McKenzie, Golden Valley, and Billings County in which the BLM does not recognize a 6 ¼ percent mineral interest in favor of the Counties because those minerals are either "public domain minerals" or were specifically excluded from the reservation in the original condemnation judgments.  Id.

After McKenzie County received the BLM's January 27, 2004, letter, McKenzie and Billings Counties exchanged several more letters with the BLM to clarify the status of certain lands. On June 18, 2004, the BLM sent another letter to Chinn and Arthaud stating the BLM would direct the Counties' request for recognition of the 6 ¼ percent royalty interest in all lands acquired through condemnation judgments to BLM's Rock Mountain Field Solicitor "for an opinion regarding [their] claim to a 6 ¼ percent royalty in lands with public domain minerals acquired through condemnation." See Doc. No. 24-2, p. 116. On December 16, 2004, BLM sent a letter to Chinn and Arthaud stating the BLM's Rocky Mountain Region Field Solicitor reviewed the Counties' claim to a 6 ¼ percent royalty interest in all lands in the condemnation judgments, and determined, in an opinion dated September 7, 2004, that "the Bureau of Land Management's decision to issue public domain mineral leases without a royalty reservation to the counties is defensible." See Doc. Nos. 24-2, p. 118 and 24-2, pp.119-22.

On March 7, 2005, counsel for McKenzie County sent a letter to the United States Department of the Interior, Office of the Solicitor requesting the office review the opinion of the Rocky Mountain Region Field Solicitor and direct the BLM to recognize a 6 ¼ percent royalty interest in favor of the Counties for all lands acquired by the United States in the condemnation judgments. See Doc. No. 24-4, pp. 15, 20. It does not appear the Department of the Interior ever responded to McKenzie County's letter.

McKenzie County then initiated this action on January 11, 2016, filed an amended complaint on April 12, 2016, and a second amended complaint on August 30, 2019. See Doc. Nos. 1, 7, and 37. The second amended complaint contains two claims. The first is for enforcement of the Court's prior judgments through a writ of mandamus. The second claim, pled in the alternative, is to quiet

13

title to the 6 ¼ percent royalty interest in favor of McKenzie County for the "public domain minerals" related to the condemnation judgments.  Both parties have moved for summary judgment.  <u>See</u> Doc. Nos. 71 and 72.


II.     **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  <u>Davison v. City of Minneapolis</u>, 490 F.3d 648, 654 (8th Cir. 2007); <u>see</u> Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  <u>Id.</u>  The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  <u>Diesel Mach., Inc. v. B.R. Lee Indus., Inc.</u>, 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  <u>Id.</u>; Fed. R. Civ. P. 56(c)(1).

If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  <u>Matsushita</u>, 475 U.S. at 587.

## III.    <u>LEGAL DISCUSSION</u>

Both parties have moved for summary judgment.  There is no dispute McKenzie County holds a 6 ¼ percent royalty interest as to the "acquired minerals" and this interest was created by the Condemnation Judgments.  The dispute is over approximately 10,000+ acres of "public domain minerals," which is a term of art created by the BLM and found nowhere in the Condemnation Judgments from the 1930's, the Declarations of Taking, or the 1991 Judgment.  The Court has carefully reviewed the parties' briefs and exhibits and the entire record, which is extensive.  The Court finds, based upon the plain language of the judgments in question, that the position of McKenzie County that the Condemnation Judgments created a 6 ¼ percent royalty interest in favor of McKenzie County in all the listed tracts of land to be more persuasive than the position of the United States.  The United States' position that the 6 ¼ percent royalty interest does not apply to "public domain minerals" is devoid of merit.

### A.    <u>STATUTE OF LIMITATIONS</u>

The United States contends both of McKenzie County's claims for relief are barred by the Quiet Title Act's 12-year statute of limitations.  <u>See</u> 28 U.S.C. § 2409a(g).  The statute provides "Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed

to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C.A. § 2409a(g).  The Quiet Title Act's 12-year time limit for bringing a claim against the United States is a nonjurisdictional claims-processing rule.  Wilkins v. United States, 598 U.S. 152, 155 (2023).  As a nonjurisdictional claims-processing rule, the limitation period in the Quiet Title Act is subject to equitable tolling, fraudulent concealment, waiver, and estoppel arguments.  Id. at 164.

This action was commenced on January 11, 2016, when McKenzie County filed its complaint against the United States.  As set forth in the second amended complaint, McKenzie County's first claim for relief is for a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a) and Rule 70 of the Federal Rules of Civil Procedure.  McKenzie County seeks an order compelling the United States to comply the Court's Condemnation Judgments from the 1930's and the 1991 Judgment. McKenzie County's second claim, which is made in the alternative, is brought pursuant to the Quiet Title Act and seeks to quiet title to the "public domain minerals."

The United States contends the first claim is barred because it seeks to quiet title.  McKenzie County maintains the first claim does not seek to quiet title because title was quieted in 1991 in federal court and all that is sought is enforcement of the Court's prior judgments.  The Court agrees with McKenzie County.  The Court is unpersuaded that it lacks authority to enforce its own judgments which, as explained below, are clear and unambiguous.

The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  Standing alone, it is not an independent source of subject matter jurisdiction.  Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A., 551 F.3d 812, 820-21 (8th Cir. 2009).

16

However, it does "give[] federal courts power to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." Nichols v. Harbor Venture, Inc., 284 F.3d 857, 862 (8th Cir. 2002).  The All Writs Act gives federal courts the power to issue writs of mandamus "to enforce our prior mandate to prevent evasion" and such mandate "encompasses everything decided, either expressly or by necessary implication." In re MidAmerican Energy Co., 286 F.3d 483, 486-87 (8th Cir. 2002).

Rule 70(a) of the Federal Rules of Civil Procedure provides that "[i]f a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified," then a court can "order the act to be done."  Fed. R. Civ. P. 70(a).  "Rule 70 gives the district court a discrete and limited power to deal with parties who thwart final judgments by refusing to comply with orders to perform specific acts." Analytical Eng'g, Inc. v. Baldwin Filters, Inc., 425 F.3d 443, 449 (7th Cir. 2005).

When the Court issued the Condemnation Judgments in the 1930's it retained jurisdiction "for the purpose of entering such further orders or decrees as may be necessary."  See Doc. No. 47-5, p. 60.  It is undisputed the Court had jurisdiction over the condemnation cases and in *McKenzie II*. What McKenzie County seeks in its first claim for relief is an order of the Court directing the United States to comply with the Court's prior orders and the judgment from 1991.  The first claim for relief does not seek to quiet title.  It is clear that title had already been quieted in *McKenzie II*.  It is enforcement that is sought in the first claim for relief.  Based on the judgments themselves, the All Writs Act, and Rule 70 of the Federal Rules of Civil Procedure, the Court finds the Quiet Title Act's 12-year limitations period does not apply to McKenzie County's first claim for relief.  The Court further finds it has the authority to enforce its prior judgments and prevent the BLM from evading

17

the clear intent expressed therein.

As for the second claim for relief, because the claim was pled in the alternative and the Court has ruled in McKenzie County's favor on the first claim for relief, the Court does not need to reach the merits of the claim.  That being so, the Court finds McKenzie County's position on the issue of timeliness is far more persuasive than that of the United States.  The United states points to and relies upon a November 17, 2003, fax from the BLM with a vague and undefined reference to "acquired minerals" and no mention of "public domain" minerals as triggering the limitations period. See Doc. No. 24-4 pp. 11-13.  It is clear and undisputed the Court did not use the terms "acquired minerals" and "public domain minerals" in the Condemnation Judgments from the 1930's or the 1991 Judgment.  See Doc. No. 76, p. 1.  Any after the fact assertion by the BLM, which was the losing party in *McKenzie II*, that these self-created terms represent the unexpressed intent of the Court is baseless.

In his declaration, former McKenzie County State's Attorney Dennis Johnson makes it clear that he and McKenzie County did not know and could not have known that the BLM was refusing to recognize McKenzie County's 6 ¼ percent royalty interest after *McKenzie II* was decided.  The BLM was difficult to communicate with, unwilling to fully share information, and the royalty checks the county received did not describe the tracts of land involved.  See Doc. No. 24-3, ¶¶ 13-14.  The BLM never notified McKenzie County of its decision to refuse to pay royalties on what it considered "public domain minerals."  See Doc. No. 24-3, ¶ 14.  The only way McKenzie County could have determined the BLM was withholding royalty payments would have been to audit oil and gas well records kept by the North Dakota Industrial Commission and royalty receipts received by McKenzie County and compare them to the tracts of land listed in the Condemnation Judgments from the

1930's.  See Doc. No. 24-3, ¶ 22.  The November 17, 2003, fax, relied upon by the United States as a trigger event for the statute of limitations,  is vague at best; fails to define "acquired minerals;" fails to define or make any mention of "public domain minerals;" and the Court did not use those terms in the Condemnation Judgments or the 1991 Judgment.  As a result, it cannot be said that the fax from the BLM in 2003 reasonably put McKenzie County on notice as to the BLM's interpretation of the Court's judgments.  The 12-year statute of limitations is not triggered if the Government's claim is ambiguous or vague.  Patterson v. Buffalo National River, 76 F.3d 221, 224 (8th Cir. 1996).


**B.    AMBIGUITY**

The United States contends the Condemnation Judgments from the 1930's are ambiguous and the 1991 Judgment did not resolve the dispute.  McKenzie County contends, and the Court agrees, that the Condemnation Judgments and the 1991 Judgment are clear and unambiguous and the issue was fully resolved in *McKenzie II*.  If a judgment is clear and unambiguous, then "it shall be construed according to its plain meaning."  Minch Family LLLP v. Buffalo-Red River Watershed Dist., 628 F.3d 960, 967 (8th Cir. 2010).

The condemnation judgments stated as follows:

That the United States of America is the owner in fee simple of the lands hereinbefore described, subject, however, to the rights of McKenzie County, North Dakota, to a 6¼ percent perpetual royalty in minerals which exist or may be developed on said lands.

See Doc. Nos. 47-2, pp. 49, 59, and 89; 47-3, pp. 50 and 72; 47-4, pp. 46, 55, and 83; 47-5, p. 59; 47-6, p. 60; and 47-7, pp. 69 and 84.

The plain language of the Condemnation Judgments clearly conveyed to McKenzie County a 6 ¼ percent royalty interest in the minerals associated with each tract of land described therein.

None of the Condemnation Judgments made any distinction between or even made any reference to "acquired minerals" or "public domain minerals," nor did the judgments make any direct or indirect reference to those terms. As the Supreme Court has explained, "a good rule of thumb for reading [a Court's] decision is that what they say and what they mean are one and the same." Mathis v. United States, 579 U.S. 500, 514 (2016). The Court sees no ambiguity in the language of the Condemnation Judgments.

In *McKenzie II*, this Court reaffirmed the plain meaning of the Condemnation Judgments and clearly recognized McKenzie County's 6 ¼ percent royalty interest. The Court held "that the recognition of a mineral reservation in the County in the federal condemnation judgments operates as a conveyance of that mineral interest in the County." See Doc. No. 20-7 (emphasis added). The condemnation actions extinguished all title McKenzie County held and the Condemnation Judgments conveyed new title (6 ¼ percent royalty interest) to McKenzie County. See Doc. No. 20-8, p. 3. The Court further directed that "judgment be entered quieting title in the County to the disputed minerals." See Doc. No. 20-7. The 1991 Judgment stated as follows:

> The Federal Government's condemnation actions against McKenzie County in the late 1930's extinguished all title McKenzie County had in the land, including any royalty interests. New title then vested in the Federal Government and through the condemnation judgments McKenzie County received the 6¼% royalty interest. The recognition of a mineral reservation in favor of McKenzie County in the federal condemnation judgments operates as a conveyance of that mineral interest to McKenzie County.
>
> It is ORDERED AND ADJUDGED that title to the disputed minerals (6¼% royalty) is quieted in McKenzie County; and the Defendants are barred from any claim in regard to the same or proceeds from the same; that McKenzie County is the owner of the disputed minerals (6¼% royalty) free and clear of any claim of the above named defendants.

See Doc. No. 20-8, p. 3. Under the plain and unambiguous terms of the 1991 Judgment, this Court

20

held that the mineral reservation in the Condemnation Judgments operates as a conveyance of a 6 ¼ percent royalty interest to McKenzie County, and quieted title to it in favor of McKenzie County. Not unsurprisingly since the terms were not used by either party in the case, the 1991 Judgment did not make any distinction between nor make any reference to "acquired minerals" or "public domain minerals." The Court defined the "disputed minerals" as the "6 ¼% royalty" conveyed by the Condemnation Judgments. See Doc. No. 20-8, p. 3. More important, the United States never appealed the 1991 Judgment.

The United States contends this cannot be so because the use of the word "reservation" in two of the Judgments On Declaration of Taking renders them a reconveyance that could only apply to lands with "acquired minerals." The United States also contends it did not gratuitously create a royalty interest in McKenzie County's favor for the lands which it describes as holding "public domain minerals." These contentions are unpersuasive for several reasons.

First, the United States fails to acknowledge the plain language of the Condemnation Judgments. The plain language is crystal clear when it states the United States is the owner of the condemned lands in fee simple "subject, however, to the rights of McKenzie County, North Dakota to a 6 ¼ percent perpetual royalty in minerals which exist or may be developed on said lands." See Doc No. 47-6, p. 60. The Condemnation Judgments neither make any mention of, nor make any distinction between, "acquired minerals" and "public domain minerals." These terms of art are not used in the Declarations of Taking or the Condemnation Judgments. Nor are these terms used in the 1991 Judgment. These terms are a fiction, created by the BLM after the fact, to justify its unwillingness to recognize the plain language of the Condemnation Judgments. The United States cannot create ambiguity by ignoring the plain language of a judgment that it failed to appeal. It

should be noted that in its reply brief (Doc. No. 76, p. 1, n. 1) the United States acknowledged that the terms "acquired minerals" or "public domain minerals" are not used anywhere in the Condemnation Judgments or the Declarations of Taking.

Second, the royalty was not gratuitous. The royalty was the result of the bargain struck between McKenzie County and the United States. The record reveals negotiations involved one price with a royalty in favor of McKenzie County and another higher price with no royalty. See Doc. No. 73-10. Ultimately, the United States received all of the land and the minerals and McKenzie County's cooperation in the "friendly" condemnation proceedings. In return, McKenzie County received a 6 ¼ percent perpetual royalty in all the land and a cash payment. See Doc. No. 47-5, p. 50. This arrangement also had the effect of simplifying a complex proceeding involving approximately 75,000 acres of land in McKenzie County. If the United States and McKenzie County had intended to limit the 6 ¼ percent royalty interest to only the "acquired minerals" they surely would have mentioned that in the takings and made sure such language was included in the Condemnation Judgments. They did not. Given the amount of oil found underneath some of the condemned lands, it is understandable that the United States regrets the bargain it struck. McKenzie County may have regrets as well. But a "deal is a deal" and there was certainly nothing gratuitous about the arrangement which was in keeping with "accepted policy at that time" to "allow counties such royalty reservations on lands optioned." See Doc. No. 73-8, p. 1.

Third, the United States' contention that the use of the word "royalty reservation" in the condemnation cases "could only have referred to lands with acquired minerals" is unpersuasive. See Doc. No. 76, p. 3. If such was the intent, there are certainly clear and concise ways to express it. The only reference to a "royalty reservation" in the condemnation cases is in the Judgment On The

Takings in At Law 1000 and At Law 1006, and the Declaration of Taking in At Law 1000.  See Doc. Nos. 47-2, p. 26 and 47-6, pp. 9 and 30.  The records as to the judgments in At Law 1028, 1002, 1007, and 1001 make no reference whatsoever to a "royalty reservation."  The final judgments in each of the condemnation cases, including At Law 1000 and At Law 1006, make no reference to a "royalty reservation" but simply refer to the right of McKenzie County to a "6 ¼% perpetual royalty."  The final judgments are the operative documents in regards to McKenzie County's royalty interest, not the Judgments on Declarations of Taking, which the United States relies upon.  In addition, the "royalty reservation" language is only found in two of the six Judgments on Declarations of Taking.  A careful review of the entire record leaves no doubt as to the meaning of the language used in the Condemnation Judgments.  The Condemnation Judgments created new title and conveyed to McKenzie County a 6 ¼ percent perpetual royalty interest in all of the condemned lands.

In addition, the United States' argument regarding the use of the words "royalty reservation" is foreclosed by the Court's decision to the contrary in *McKenzie II*.  In *McKenzie II*, the Court specifically held the Condemnation Judgments vested new title in the federal government and McKenzie County received a 6 ¼ percent royalty interest in the condemned lands.  See Doc. No. 20-8, p. 3.  The Court did not limit or qualify this holding in *McKenzie II* in any manner nor make any reference to "acquired minerals" or "public domain minerals."

### C.   CLAIM TWO – QUIET TITLE

McKenzie County's second claim, which is made in the alternative, asks the Court to quiet title in the disputed minerals.  Having already quieted title in favor of McKenzie County in 1991,

the Court need not address the issue again.  Were the Court to address the issue again, it would reach the same conclusion it reached in 1991, namely that the 6 ¼ percent royalty interest belongs to McKenzie County and pertains to all tracts of land listed in the Condemnation Judgments.

## IV.    **CONCLUSION**

The Court has carefully reviewed the entire voluminous record, the parties' briefs, and the relevant case law, and finds the Plaintiff's contentions persuasive.  For the reasons set forth above, the Plaintiff's motion for summary judgment (Doc. No. 72) is **GRANTED** and the Defendant's motion for summary judgment (Doc. No. 71) is **DENIED**.  In addition, the Court **DECLARES** and **ORDERS** as follows:

1.     McKenzie County's request for a Writ of Mandamus is granted in full.

2.     McKenzie County's 6 ¼ percent royalty interest created by the Condemnation Judgments applies to both the "acquired minerals" and "public domain minerals" as those terms have been defined by the Bureau of Land Management.

3.     The United States is directed to comply with the plain language of the Condemnation Judgments which clearly and unambiguously conveyed to McKenzie County a 6 ¼ percent royalty interest in all tracts of land listed therein, save for those tracts specifically exempted.

4.     The United States is directed to comply with the plain language of the Court's 1991 Judgment which quieted title in favor of McKenzie County in the disputed 6 ¼ percent royalty interest created by the Condemnation Judgments.

**IT IS SO ORDERED**.

Dated this 29th day of November, 2023.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

24